Our next case today is Shenzhen Network Technology v. Sun Pleasure, Case No. 22-1912. Ms. Lavallee. Did I say your name right? You did. I feel like I probably did. You may proceed when you're ready. Thank you, Your Honor, and may it please the Court. The Board erred in two material respects in determining that Shenzhen had failed to show that claims 1 through 9 of the 555 patent are obvious, each independent ground for reversal or renewal. First, the Board erred in finding that the patent owner had met its burden to corroborate that the invention was actually reduced to practice prior to May 27, 2005, critical date of prior outlook by relying on a mattress that was purchased online in 2020 and without any contemporaneous evidence from the 2004-2005 timeframe showing or even discussing the claims' internal structural features of the alleged reduction to practice mattress. Second, the Board also committed multiple legal errors in upholding the claims as non-obvious based on the prior master patent in combination with the knowledge and skill of a person of ordinary skill and art. I'd like to start with the first issue regarding lack of corroboration. During the IPR, Sun stipulated they locate no documents whatsoever from the relevant timeframe showing the internal design of the mattress that the inventor reportedly conceived of and reduced to practice by December 22, 2004 and was allegedly shipped through April 25, 2005. Acknowledging this, the Board stated in its decision that, with respect to the key internal features of the claimed mattress, Sun's contention that Inventor Lau's reduction to practice testimony is corroborated sufficiently turns on whether a mattress purchased in 2020 by the inventor's business associate is one of nine 2083 products produced by the patent owner prior to May 27, 2005. Reviewing all of the evidence on record, there is nothing, much less substantial evidence, that it is. So can I ask you, Mr. Liu, right, he has a declaration and he said that the article that was shipped before the priority date was actually, did have all the features of the claim, right? Mr. Liu is the inventor's brother. Oh, I got the name confused. I'll just say the inventor. Inventor Lau. Mr. Lau. Yes. So Mr. Lau did testify or declare, I guess, that the product had all the features of the claim, right? And then the question, as I understand it, is whether there's enough corroborating evidence under the rule of reason to corroborate what he said. Because it's not as if there's no evidence whatsoever. It's a question of corroboration of his interest in testimony, right? Your Honor, you're correct that he did testify that, although our position is that there's no corroboration. I understand. Now, your view that there's no corroboration is partly that you think there's nobody, there's no other direct evidence, right, to show that what he's saying is true. Instead, it is the corroboration takes the form of evidence, for example, showing that it had a particular product number on it, the one that was shipped before the priority date had a particular number on it, the one that was purchased after the priority date had the same number on it, and testimony that these product numbers, when there's a product number assigned, it doesn't change, right? There is a lot of evidence and interested witness testimony that is part of the record. But we would say none of that evidence is actually corroborated, which is required under this case law. Isn't it only the inventor's testimony that has to be corroborated? It is the inventor's testimony that has to be corroborated. But none of the documents that the board relied on or that some submitted are corroborating without the inventor's testimony. But they do not corroborate the inventor's testimony? They do not. Not that they're not corroborated themselves, because they're not required to be corroborated, right? That's correct, Your Honor. They do not corroborate the inventor's testimony that he produced the mattress to practice prior to the critical date. Without his testimony to corroborate that. I think you're trying to make an argument that something is somehow circular or something in that regard, but could we look at at least the summary that I was using that was in the red brief around page 32 on? I think it was trying to summarize up some of the evidence that would go to reduction to practice. And it starts at the bottom, I think, of 32 on. I thought it was kind of summing up some of the evidence that my colleague so nicely summarized from memory. But I had to use the brief to help me a little bit. Do you agree that this is some of the evidence we're looking at? I think it goes on from 32 through about 35 to 36-ish that we're looking at as the possible evidence that could corroborate the inventor's testimony. Yes, Your Honor. This is the list of the evidence that Sun is relying on for corroboration. But, again, we have to look at all of this evidence to determine whether or not any of it actually corroborates the inventor's testimony. But to just follow up on my colleague's good question about the fact that some of this evidence may be more indirect in nature in terms of the corroboration, would you agree that at least when you look at some of this evidence, it could indirectly corroborate the inventor's testimony? No, Your Honor. I respectfully disagree with that. Okay. Then tell me more. Sure. And I think we have to look at all of the evidence individually to see why it's not corroborating. And if we could start with, so Inventor Lau testified that the mattresses were all shipped by April 25, 2005. All of the products, 92083, bearing the product number 92083, were shipped by April 25, 2005. That date doesn't appear anywhere in the record. All we have are projected shipping schedules and purchase orders. From December 2004 that say that some product, we don't know what the design of that product was, were going to be shipped through April 24, 2005. We don't know that those shipping schedules were adhered to. We don't know what products or what the design of the products that were going to be shipped on that schedule were. We don't know if additional products weren't shipped later, including at the end of 2005, early 2006. We don't know because there's no evidence in the record to say that the 92083 products, bearing the internal structural features of the mattress, were all shipped by the projected shipping date of April 24, 2005. We don't know that except with the inventor's testimony. I just wanted to ask, like, you know, it's hard because it's a rule of reason, right? So the rule of reason says that the inventor's testimony doesn't have to be verbatim corroborated. It's not as if everything he said has to be corroborated. So you've got a little bit of a difficult burden here because you need to convince us that as a matter of law, there wasn't enough here under the rule of reason, right? Yes, Your Honor. I do agree. It is a burden here to show there's no substantial evidence of corroboration under the rule of reason. However, I think this is a unique case because in this case, the only evidence of record showing any structure bearing the internal features of the claimed invention, which are key claims of the invention, is a mattress purchased in 2020 by the inventor's business associate off of Amazon. And there is nothing. The board had the fact dispute in front of them, and they found, they were persuaded, you were heard, they were persuaded that that was an embodiment that was created before the critical date. So, I mean, how do you overcome them finding that there was substantial evidence that what was purchased in 2020 by, you know, an interested person existed and was shipped at the relevant time many years earlier? Because, Your Honor, there was no evidence. There was evidence. You just don't think that the board should have been persuaded by it. But there was simply no evidence tying that 2020 mattress to the products that were alleged. The tie was that the board found it existed in the very same form it was found in 2020, that that very box existed back in, I think it was 2004, had never been opened. And, you know, it didn't change magically while it was inside the box. Maybe that's right. Maybe it's wrong. But it sure seems like there's substantial evidence to support that conclusion. And respectfully, Your Honor, I would say that there isn't. And the board even acknowledged in its decision that Pat Hunter's argument that the 92083 specimen, which is the 2020 mattress, is an accurate example of the 92083 product, based on both having the same product number, is not particularly strong. This is because— I just—I don't see how that helps you. That shows the board was engaged in doing its job and weighing the facts and came out the way it came out. But the board relied on evidence that it found was not particularly strong. Are they not permitted to do that? They are not permitted to do that because there needs to be independent corroboration of inventor's testimony. Okay, but you don't mean to say—I'm sorry—that they can't rely on evidence they find is weak. They can add up a bunch of weak evidence and add it to maybe other evidence they think is strong, can't they? They can do that, Your Honor, but I don't think that was—that was not the situation here. Instead, the board relied on evidence that simply did not corroborate that the 2020 mattress was— had the same internal design of anything that was created during the relevant timeframe. There just isn't anything— In your view, what would have been enough? In your view, what did you need to see in order for it to be sufficient? Well, again, going back to the projected shipping schedules, perhaps it would have been helpful to say that the last 92083 product was shipped at a certain date. We don't have that, so we don't know if further products were shipped after that date. Perhaps a declaration from a manufacturer of the mattress saying what the internal structure was during the relevant timeframe and that the 2020 mattress—the structure of that mattress matched their recollection of what they manufactured during that timeframe. Or perhaps a declaration from a Walmart employee stating that the mattresses they received during the relevant timeframe had the same structure as the 2020 mattress. There are a host of ways that they could have provided adequate corroboration, and they didn't do that here. I don't want to—I'm mindful of the time, and I know that you have other issues that are important to this case, even if you're not successful on this particular issue. Would you like to address those? I would, Your Honor, and thank you. And I see I'm already into my rebuttal time. So very briefly, I think I will discuss the Board's errors regarding their finding that the challenge claims were not obvious based on mastery in combination with the knowledge and skill of a person with ordinary skill in the art. And sticking with Wu, I think I'll focus on that argument. Even if you uphold the decision that Wu is not prior art, we think it was improper for the Board to reject Mr. Kuchel, Shenzhen's expert's testimony, and reliance on Wu to show what would have motivated a procedure around this timeframe. Can I just make a short circuit? If we were to agree with you on that point but on nothing else, where would that leave us? If we say the Board should not have rejected your expert out of hand because of a mistake on Wu, what would we do? I think we would say that reversal would be appropriate based on the record because this is a very similar case. Do you mean actual reversal? Actual reversal, yes. So we would tell the Board the claims were invalid just based on that mistake? I think there is enough evidence in the record for you to find the claims obvious and reverse. I think a more appropriate remedy would be a remand back to the Board for it to consider all the evidence of record and correct the legal errors that we identified in our brief. How about if we hear from the other side? Mr. Ranker? Yes, Your Honor. Thank you. May it please the Court? You asked about Wu and what if it was error to not consider Wu whatsoever. Wu thought he invented the continuous internal wall going all the way around the mattress with holes therein. If you look at Wu, he thinks he invented that. He happens to be wrong on that point. If you look at Wu's characterization of the prior art in Figure 1 in Wu, it's different from Figure 2, which is what he invented. He explains Figure 1 is a prior art figure and it does not have the continuous wall. He thinks he invented the continuous wall. I thought Wu, if we're talking about Wu, I don't know if you're talking about Wu in terms of the second ground where Wu is just being relied on for state of the art, but Wu really is state of the art that you'd be looking at is the background section of Wu, right, that talks about the problems with the mattress bunching and such, not necessarily Wu's solution to that problem. So I don't know why you're talking about Wu's solution. Right. So the point I'm making is it would be the very picture of hindsight bias to conclude that the motivations that Wu came up with, he recognized a problem in the article. But he didn't come up with the solution. I mean, when we talk about relying on Wu for state of the art, you're not suggesting that we should consider his solution, are you? I'm suggesting that his solution, his idea that this was a solution that was non-obvious and he filed a patent on, you can't take that as explaining why what we came up with was obvious, why what Vincent Lau came up with was obvious. My question actually is a very friendly question for you. I'm surprised that you would have us look at the solution that Wu teaches when Wu is just being relied on as state of the art. Right. So I think I may be mischaracterizing it. The state of the art in Wu is a discontinuous internal being, right? And the motivations don't teach the missing element that when they don't appeal ground one, we're limited to the Metzger discontinuous wall. Once we're limited to that, that frames the scope of review here. Right. The board found in ground one, which is not appeal, that Metzger is limited to the four discreet and discontinuous themes with gaps in the corners. With that finding, Shenzhen never took the position that you go from the discontinuous themes, you would then make it continuous. Then once it's continuous, you would add passages in that modified discontinuous to now continuous being. They never put that position below. Instead, if you look at the discontinuous being analysis of Metzger, it's if you have these four discontinuous themes, Shenzhen argued that it would be obvious to effectively poke holes in those discontinuous themes to make it more freely inflate. The board considered that. The board found that reasoning conclusory and unsupported in comparison to our expert, Dr. Lentz, testimony analysis explaining why it's low flow. No person of skill in the art would see that as something that would actually help the inflation of the mattress. So the board rejected the discontinuous internal being of Metzger, how you would change that, how you would modify that to reach the fluid passages. That was not appealed. I think the really important thing is how did Shenzhen in round two get from Metzger to our claims? That's where they assumed that the wall was already continuous. So if we find the board erred by failing to consider evidence that Shenzhen presented, what relief should we grant? So with regards to, if you think that the board was required to consider the very limited part of Wu about the background, you would have to remand for the board to consider that. But that being said, just that there is case law that explains that just because something is put in the background does not necessarily mean it is prior art. Just because it sits in the background doesn't mean it's automatic. It's not being relied on as prior art, right? That's being relied on for state of the art. Right, but the state of the art, if you're looking at the state of the art, if you're looking at Wu in figure one, it shows a discontinuous beam, right? If you look at the seams on figure one of Wu, on the top seams, it's a vertical discontinuous wall. So you're arguing that Wu is different than the patent that was at issue in Yeida, where we said that in fact the patent could, at least the background section of the patent, the recognition of the problem could be considered as being state of the art? Well, so I think those cases, I think you have to consider what the document is discussing and how it's probably associated with that. Could you just say yes or no first? I mean, are you distinguishing this case from Yeida? Yes. Okay. So basically, if you look at the several cases we cited, one, the example is a pharmaceutical research study or the case about how a drug, how could a drug go from being unknown five days ago to generally known to everybody, right? Or a drug study that went on for several years, right? So the document published a couple days after says this drug study went on for several years. It has details about the drug study, what was going on in the drug study. So it's probative of, even though published five days late, of what happened during that time period. Wu is in ground for or found that it is not prior art. And so there is no explanation, Wu, of what was going on when. What's your best response to Shinzen's argument that the purchase orders used to corroborate Mr. Lau's testimony show only projected shipping dates? So if you look at the email where they made a big point about how the shipping dates were changing, the only shipping dates that changed were the first two shipping dates. And there's no email saying that the last shipping date changed. And it's the last date on the schedule. So there's evidence that if we're changing the shipping dates, we tell Walmart, right? If we have to change the schedule, we tell them. And there's no evidence that in April there was an email at Walmart, hey, we're changing the shipping schedule. So you're left with the last date is the date it says it. That's the last date. And so then, and that's not the only thing that corroborates Vincent Lau's testimony. There's, I think you mentioned the box. What about, I tried to use, I thought you were going to go to my, isn't this your list? What's that? Oh, yeah, we have the list. It's in the list. Yeah. It's in the list. Oh, no, you're. I'm throwing you a softball here. I don't know if you want to hit it, but. Yeah, yeah, yeah. So we have the list, right? But like exactly as you recognize, we have a whole host of evidence that the board considered. And there's evidence they considered. But one key thing is that the product box matches the design of the product box. And how is this going to magically change when it's sitting in a sealed box? We have the specimen in living color showing every single internal feature. But getting back to ground two. Before you go back to that. Could you respond to the argument that your evidence of corroboration is just circular and that it really has no independent weight if you don't believe the evidence provided directly by the inventor? Right. So the circular argument is based on the Aperture case. And the Aperture case, actually a former colleague of mine argued, that case had an e-mail. And then the testimony was this document attached to the e-mail. But they didn't provide that document. We have the e-mail. And then the e-mail lists as the attachment, you know, whatever.xls. And then we produce the attachment. So the circular corroboration in the Aperture case was, here's this e-mail. And the inventor is saying, I have this document attached to this e-mail, which I'm not providing you. We're different. We said, here's the e-mail. The e-mail says, Excel file, whatever it may be. And then we produce the Excel file. So the circular corroboration argument just completely misunderstands the Aperture case. And the ‑‑ but getting back to Ground 2, Ground 2 is Appendix 141 to 143. That is where the scope of the Ground 2 analysis is. Now, within that analysis, yes, they do cite other portions of the record. They cite features of Ground 1 because Ground 1 is incorporated one for one for almost every limitation except for passage. If you go through Appendix 141 to 143 and back check all the cites, they never discuss Davis or Reed or Plamenco or any of these other background references or state‑of‑the‑art references. They're never identified with particularity as the evidence that supports the ground petition. That is required by 35 U.S.C. 312. So on appeal for the first time, we're hearing about how Davis and Reed and Plamenco are part of the state‑of‑the‑art that render the claim obvious. And that is ‑‑ Instead of relying just on common sense principles? Right. So they're arguing new references that were not ‑‑ I mean, it would be reversible error for the board to consider 35 U.S.C. Under 35 U.S.C. 312 to consider Davis and Plamenco, the references that were not cited within the grounds. And getting back to the common sense, this is where once the board says Metzger is limited to discontinuous, the whole common sense rationale is founded on the idea that Metzger has a continuous fee. Right? They assume that Metzger had a continuous fee and that there was a single inflation ballot. Therefore, it would be common sense to include the third passage. That was the argument. Now, that argument is wrong because they didn't appeal ground one where the board said it's discontinuous. So now on review, we're left with a final finding of ground one that's discontinuous. And if you say, oh, no, that's not final, there's certainly substantial evidence that it's only discontinuous and there's no preference for ‑‑ So because your point is if it's discontinuous, there's no reason to add the whole. Right. Exactly. And the board ‑‑ and the only reason to add the whole was the more freely inflate discussion. And that was where the board found their expert's reasoning conclusory and unsupported and compared and contrasted to our expert's reasoning that was detailed. And, I mean, I remember at the deposition asking Mr. Pritchard, did you perform any calculations to determine this? And he sort of laughed at me and said, no. But there was just conclusory reasoning. So if you're left with the discontinuous being, the only analysis is conclusory reasoning. That's it. That's the end of the discussion. I have heard you to, or at least understood you to respond to an earlier question that if we do think that the board erred in dismissing all of Wu and dismissing their expert's testimony about Wu, that we would need to vacate and remand. But in your brief, I think you take a different position. You say remand of ground two would be futile. So which is it? Would we need to vacate and remand or would it be futile to do so? Well, it would be futile because you're left with the discontinuous being. There's no ‑‑ on remand, the board would be limited to the discontinuous being. So does that mean if we find the error that we are talking about, what would you have us do at that point? That would be a harmless error. Because when you remand it down to the back of the board, you're left with a discontinuous being and no way to get from the discontinuous being to the continuous being that needs to be there for it to be common sense to add the third passage. Once you're left with a discontinuity, if you remand it for further consideration, there's no other result that can happen other than upholding the privilege of the plaintiffs. Your opposing counsel, it seems very intent on wanting evidence of collaboration. It's very direct and focused, especially on the internal nature. Do you have a response to that you want to give us before you conclude? I don't know what's more direct than a physical sample that was in a sealed box. I mean, I can't imagine anything more direct. This case is different than most swear-behinds I think you'd probably look at. Most of the time you're looking at, say, a lab notebook, and a lab notebook and a patent claim and a patent disclosure, they don't always match one-to-one. We have a physical product that was in a sealed box. There's no dispute over whether that box was sealed or not. Dr. Letton opened it and said, look, it tore for the first time, and we have all the shipping schedules. I think the one last point I'd like to make is December 30, 2004, was when the commercial mass production run was submitted to the lab for testing. There's e-mails showing that it takes about seven days, five to seven days, to do that test. The test came back January 6th. A photo that matches the specimen was produced January 7th with a watermark and metadata, and there's no evidence of any changes after that. So from December 30, 2004, when the mass production sample was submitted to the lab, to the last ship date corroborated by Vincent, there's no evidence of any change. And with that, we have the physical specimen, and that's all unique, just the one specimen that must have been produced by that last ship date. Thank you. Thank you, Mr. Renner. We're going to hear from Ms. Lavallee. Thank you, Your Honor. With my remaining time, I'd like to just briefly address Sun's argument that Shenzhen limited its ground to the discontinuous beam structure. I think the record amply supports that that's not the case. Instead, Shenzhen has two theories. One, that a CUSIDA would have been motivated to add additional fluid passageways in addition to the gaps between the discontinuous cork beams. We're not occurring that here. That's not the subject of this issue. The second theory is that a CUSIDA would have been motivated to extend discontinuous beams of METSCART around the corners and include fluid passageways there free. And I think the most apparent example of this argument is in Appendix 1.2, which is in our petition. And there are multiple other citations to the record that we included in our brief on that point. So I don't think that the remand would be futile if the court does find that the board unless there are any additional questions. I'll conclude. Okay. Thank you, Mrs. O'Reilly. We thank both counsel. The case will be taken under submission.